George Marco, Esq. (GM-8253)
Marco & Sitaras, PLLC
Attorneys for Plaintiff
33 Whitehall Street, 16th Floor
New York, New York 10004
(212) 430-6410
E-mail: gmarco@gmgslaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
MIKADA GROUP, LLC,

                Plaintiff,

      - against -

T.G. NICKEL & ASSOCIATES, LLC, JEFF COOPER
and LIBERTY MUTUAL INSURANCE COMPANY,

                Defendants,

-------------------------------------------------------------- X




Case No.: 13 CIV 8259 (CM)

**AMENDED VERIFIED COMPLAINT**

      Plaintiff, MIKADA GROUP, LLC, by its attorneys, Marco & Sitaras, PLLC, as and for its verified amended complaint against defendants T.G. Nickel & Associates, LLC, Jeff Cooper and Liberty Mutual Insurance Company alleges as follows:

### NATURE OF THE ACTION

      1.    This is an action, *inter alia*, to recover monies due to plaintiff Mikada Group, LLC ("Mikada") from defendants T.G. Nickel & Associates, LLC ("T.G. Nickel"), Jeff Cooper ("Cooper") and its surety defendant Liberty Mutual Insurance Company ("Liberty) based upon T.G. Nickel's breach of a construction contract in connection with the construction project known as "College of Staten Island – Construction of Student Housing Facility".

1

## PARTIES

2. Plaintiff Mikada is a limited liability company duly organized and existing under the laws of the State of Texas, with its principal place of business located at 3724 Creekmont, Houston, Texas 77091. Mikada's members are John Morris and Karen Morris both of whom reside in the State of Texas.

3. Upon information and belief, defendant T.G. Nickel is a limited liability company organized and existing under the laws of the State of New York with its principal place of business located at 22 Colt Court, Ronkonkoma, New York 11779.

4. Upon information and belief, defendant Cooper is a resident of the State of New York residing at 22 Colt Court, Ronkonkoma, New York 11779, and is a member, officer, shareholder, manager, owner, director, operator and/or sole employee of defendant T.G. Nickel.

5. Upon information and belief, defendant Liberty is an insurance company duly licensed to write surety bonds in and about the State of New York with its principal place of business located at 175 Berkeley Street, Boston, MA 02116.

## JURISDICTION AND VENUE

6. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332(a)(2) by reason of diversity of citizenship of the parties and the amount in controversy exceeding the sum of $75,000.00 exclusive of interest and costs.

7. Venue is proper in this Court pursuant to a contractual choice of forum clause designating this district.

## FACTUAL ALLEGATIONS

8. Mikada repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth at length herein.

9. Upon information and belief, in or about 2012, defendant T.G. Nickel, as General Contractor, entered into a contract with non-party CSI Student Housing, LLC ("CSI"), as Owner, for the construction of a student housing facility known as "College of Staten Island – Construction of Student Housing Facility" (hereinafter "Project")

10. The Project consisted of the construction of two (2) new residence Halls, the "North" and "South" buildings, with a total number of 133 fully furnished apartments.

11. Upon information and belief, non-party American Campus Communities, Inc. ("ACC"), acted as CSI's construction manager for the Project. ACC, a Texas based company, touts itself as the largest owner and manager of high-quality student housing communities in the United States, with expertise in the design, finance, development, construction management, and operational management of student housing properties.

12. Mikada, which specializes in millwork and is also based in Texas, had performed work on other college campuses involving ACC outside the State of New York prior to the College of Staten Island Project.

13. In or about December 2011, ACC advised Mikada about the Project in New York and introduced Mikada to T.G. Nickel.

14. In furtherance of the Project, in or about December 2011, Mikada's president, John Morris ("Morris"), and T.G Nickel's Project Manager, Doug Renna ("Renna"), engaged in discussions concerning the installation of the cabinets and countertops (hereinafter "millwork") that were to be fabricated, delivered and installed in each apartment of the 2 new residence Halls.

15. Mikada, having performed similar work in the past, although never in New York, was interested in bidding the project to T.G. Nickel as a non-union contractor.

16. Accordingly, in or about December 2011, Morris advised Renna that Mikada would estimate the work and subcontract with T.G. Nickel once a price was agreed to but solely upon the condition that Mikada could bid and perform the project as a non-union shop.

17. Mikada, being based in Texas, was not a signatory to any union agreements covering its millwork in New York nor did it intend to sign up with any unions since it had always been a non-union shop.

18. In response, Jeff Cooper ("Cooper"), who represented to Morris that he was an owner of T.G. Nickel, advised Morris that the Project was to be performed as an "open shop", which he explained meant that both union and non-union subcontractors could work on the project side by side and that it would not be an issue for Mikada to bid the Project as a non-union contractor.

19. Cooper further assured Morris that the employment of solely non-union labor by Mikada on the Project would not cause any stoppages and/or disturbances as a result of any protest from any of the local labor unions in New York covering Mikada's millwork and that there would be complete labor "harmony" on the Project.

20. Based upon Cooper's and T.G. Nickel's representations, in or about April 2012, Mikada entered into a written subcontract with defendant T.G. Nickel wherein Mikada agreed to furnish and install the millwork for the project for the agreed upon price of $324,967.00 (the "Subcontract").

21. Mikada's price was based upon the use of strictly non-union labor for the project, as agreed to by the parties.

22. Mikada duly commenced performance of its subcontract by fabricating the millwork for the "North" Building and delivering it to the site in or about May 2013.

23. However, as soon as Mikada commenced to unload the millwork at the worksite, members of the local carpentry union in New York City ("Carpenter's Union") surrounded the millwork and Mikada's workers. Said members damaged some of the millwork and threatened Mikada's worker's with physical violence thereby forcing Mikada's work to vacate the site out of fear for its safety.

24. The Carpenter's Union thereafter became a daily fixture at the worksite, and no work could proceed thereafter without any union labor.

25. Accordingly, in or about May 2013, ACC, the Owner's representative, and T.G. Nickel directed Mikada to employ union labor despite T.G. Nickel's assurances that Mikada could perform the project with non-union labor.

26. In or about May 2013, ACC directed Mikada to submit the additional cost of $28,267.73 for the employment of union labor to T.G. Nickel as determined by ACC.

27. In a good faith effort to minimize the delays that had already been caused by the union stoppages and disturbances, on or about May 13, 2013, Mikada submitted the additional cost of $28,267.73, as determined by ACC, to T.G. Nickel as a change order proposal for the employment of union labor on the project with the further written representation that the change order would be supplemented if additional costs were incurred.

28. On or about June 3, 2013, T.G. Nickel issued a change order to Mikada in the amount of $28,267.73 for the provision of union labor "as per ACC's direction".

29. Mikada duly acted upon ACC's and T.G. Nickel's directive to employ union labor and provided such labor for the project for the installation of millwork in the North building until such time as Mikada had expended all of the funds it had available in its subcontract and Change Order for the installation of millwork on the entire project.

30. In addition to expending all available funds for millwork installation as a direct result of having to employ union labor, the union labor itself was incompetent and incapable of installing the millwork in a workmanlike manner. In addition, the union labor was intentionally delaying the project in an attempt to prolong it and reap the benefit of additional hourly pay.

31. Accordingly, in or about June 2013, Mikada notified T.G. Nickel of the intolerable situation and in resolution thereof the parties ultimately agreed that Mikada would continue to fabricate and deliver all millwork for the remaining portions of the Project and that T.G. Nickel would provide the union labor directly at no additional cost to Mikada.

32. The parties further agreed that Mikada's original subcontract price would remain intact without any deductions and/or sett-offs thereto for the employment of union labor by T.G. Nickel.

33. In accordance with the parties' agreement, Mikada thereafter provided all of the remaining millwork for the project and duly requested payment of the remaining contract balance, in accordance with the parties' agreement, which T.G. Nickel neglected and refused to pay.

34. Subsequent to Mikada's completion of the Project, Morris was advised by the Carpenter's Union representative, Eamonn Carey ("Carey"), that prior to Mikada's bid to T.G. Nickel for this Project, Carey told T. G. Nickel that the Carpenter's Union would not permit the installation of any millwork without employment of union labor and that any attempt to do so by T.G. Nickel would be met with demonstrations and work stoppages.

## FIRST COUNT
(Fraudulent Inducement)

35. Mikada repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth at length herein.

36.     In order to induce Mikada into entering into a subcontract for the millwork in connection with the Project, T.G. Nickel represented to Mikada that it could bid the project as a non-union contracter without any negative implications when in fact T.G. Nickel knew that it could not.

37.     T.G. Nickel further represented to Mikada that it could perform the work solely with non-union labor and without any stoppages and/or disturbances and that there would be complete "labor harmony", when in fact it knew that none of these statements were true and that Mikada would be unable to install the millwork without employing union labor.

38.     In addition, T.G. Nickel intentionally omitted its conversations with Carey of the Carpenter's Union wherein Carey told T. G. Nickel that the Carpenter's Union would not permit the installation of any millwork on the Project without employment of union labor and that any attempt to do so by T.G. Nickel would be met with demonstrations and work stoppages.

39.     Mikada relied upon the false representations and omissions of T.G. Nickel in entering into the subcontract and in fact based its decision to do so upon said false representations and omissions.

40.     Upon entering into the subcontract with T.G. Nickel, Mikada fabricated the millwork in Texas and delivered it to the worksite, however as soon as Mikada unloaded the millwork it was prevented from proceeding any further by the Carpenter's Union just as Carey of the union had stated when he spoke to Cooper of T.G. Nickel prior to formation of the subcontract.

41.     As a direct result of T.G. Nickel's fraudulent inducement Mikada suffered work stoppages and disturbances which delayed its work and caused damages to its millwork.

42. In addition, Mikada was forced to hire union labor to install the millwork which resulted in increased costs for which it has not been compensated.

43. By reason of the foregoing, defendants T.G. Nickel and Cooper are liable to Mikada in an amount not less than $229,909.22, together with pre-judgment interest from July 30, 2013, costs, disbursements and attorney's fees incurred in this action.

## SECOND COUNT
(Breach of Contract)

44. Mikada repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth at length herein.

45. Mikada duly performed all of the terms and conditions of its subcontract with T.G. Nickel and fabricated, delivered and installed all millwork requested of it in an amount not less than $354,531.73, no part of which has been paid to date, except the amount of $124,622.51, thereby leaving a balance due and owing in an amount not less than $229,909.22.

46. By reason of the foregoing, defendant T.G. Nickel is liable to Mikada in an amount not less than $229,909.22, together with pre-judgment interest from July 30, 2013, costs, disbursements, and attorney's fees incurred in this action.

## THIRD COUNT
(Account Stated)

47. Mikada repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth at length herein.

48. Mikada delivered invoices and statements of account to T.G. Nickel on a regular and timely basis evidencing the labor, materials and services furnished to the Project, and the amounts due thereon.

49. Said invoices and statements of account indicated an outstanding balance due to Mikada from T.G. Nickel in the sum of $229,909.22.

50. T.G. Nickel accepted and retained said invoices and statements without objection.

51. More than 30 days has elapsed since Mikada presented the most recent invoice or statement reflecting the outstanding account balance and T.G. Nickel has not responded, objected to or paid the account balance.

52. By reason of the foregoing, defendant T.G. Nickel is liable to Mikada in an amount not less than $229,909.22, together with pre-judgment interest from July 30, 2013, costs, disbursements, and attorney's fees incurred in this action.

### FOURTH COUNT
(Quantum Meruit)

53. Mikada repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth at length herein.

54. Mikada has furnished labor and materials to T.G. Nickel having a fair and reasonable value of not less than $354,531.73.

55. Mikada performed said work in good faith, and with the expectation that it would be paid by T.G. Nickel.

56. T.G. Nickel accepted and retained the benefit of the work performed by Mikada, but failed to pay Mikada, except the amount of $124,622.51, thereby leaving a balance due and owing in an amount not less than $229,909.22.

57. By reason of the foregoing, defendant T.G. Nickel is liable to Mikada in quantum meruit for the fair and reasonable value of said work in an amount not less than $229,909.22, together with pre-judgment interest from July 30, 2013, costs, disbursements, and attorney's fees incurred in this action.

## FIFTH COUNT
(Payment Bond Action Against Liberty)

58. Mikada repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth at length herein.

59. In furtherance of the Project, T.G. Nickel, as principal, and defendant Liberty, as surety, executed and furnished to the Owner, CSI, a labor and material payment bond (bearing Bond No. 015034802), guaranteeing prompt payment of moneys due to all persons furnishing the Principal, with labor and materials used in the performance of the project. A copy of the payment bond is annexed hereto as Exhibit "A".

60. Mikada having furnished labor and material for the performance of work on the Project is a beneficiary of the bond.

61. By reason of the furnishing of said work, Mikada has a proper claim against defendant Liberty under the terms of the labor and material payment bond in an amount not less than $229,909.22, no part of which has been paid although duly demanded.

62. By reason of the foregoing, Liberty is liable to Mikada in an amount not less than $229,909.22, together with pre-judgment interest from July 30, 2013, costs, disbursements, and attorney's fees incurred in this action.

**WHEREFORE**, Mikada demands judgment as follows:

1) On the First Count against defendants T.G. Nickel and Jeff Cooper in an amount to be determined at trial but not less than $229,909.22, plus pre-judgment interest from July 30, 2013, costs, disbursements and reasonable attorney's fees incurred in this action;

2) On the Second Count against defendant T.G. Nickel in an amount to be determined at trial but not less than $229,909.22, plus pre-judgment interest from July 30, 2013, costs, disbursements and reasonable attorney's fees incurred in this action;

3) On the Third Count against defendant T.G. Nickel in an amount to be determined at trial but not less than $229,909.22, plus pre-judgment interest from July 30, 2013, costs, disbursements and reasonable attorney's fees incurred in this action;

4) On the Fourth Count against defendant T.G. Nickel in an amount to be determined at trial but not less than $229,909.22, plus pre-judgment interest from July 30, 2013, costs, disbursements and reasonable attorney's fees incurred in this action;

5) On the Fifth Count against defendant Liberty in an amount to be determined at trial but not less than $229,909.22, plus pre-judgment interest from July 30, 2013, costs, disbursements and reasonable attorney's fees incurred in this action; and

6) That Mikada have such other and further relief in the premises as to this Court seems just and proper.

Dated: New York, New York
February 5, 2014

By: _____

George Marco (GM 8253)
Marco & Sitaras, PLLC
Attorneys for Plaintiff
33 Whitehall Street, 16th Floor
New York, New York 10004
(212) 430-6410

## VERIFICATION

STATE OF TEXAS      )
                    ) ss.:
COUNTY OF HARRIS    )

JOHN MORRIS being duly sworn, deposes and says:

That deponent is the CEO of the plaintiff, Mikada Group, LLC, herein; that deponent has read the within Amended Complaint and knows the content thereof, and that the same are true to deponent's own knowledge.

The reason this verification is made by deponent is that deponent is the CEO of plaintiff and is familiar with the facts and circumstances alleged herein.

The sources of deponent's information and the grounds of deponent's belief as to all matters not herein stated upon deponent's knowledge are as follows: books and records of the corporation.

_____
JOHN MORRIS

Sworn to before me this
3rd day of February 2014

_____
Notary Public



DEBORAH KAY THOMPSON
Notary Public, State of Texas
My Commission Expires
August 24, 2017